IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE
AT JACKSON

Assigned on Briefs November 12, 2008

## STATE OF TENNESSEE v. LUIS ANGEL CRUZ

**Direct Appeal from the Circuit Court for Madison County**
No. 07-517      Roger A. Page, Judge

**No. W2008-00677-CCA-R3-CD  - Filed December 12, 2008**

The defendant, Luis Angel Cruz, was indicted by the Madison County Grand Jury on one count of aggravated child abuse based on injuries he caused to his five-month-old daughter, who was diagnosed with shaken baby syndrome. Following a jury trial, he was convicted of the lesser-included offense of reckless aggravated assault, a Class D felony, and sentenced by the trial court as a Range I offender to four years in the Department of Correction. On appeal, he challenges the sufficiency of the convicting evidence, arguing there was insufficient proof to show that he was aware he risked injuring the child by shaking her. Following our review, we affirm the judgment of the trial court.

**Tenn. R. App. P. 3 Appeal as of Right; Judgment of the Circuit Court Affirmed**

ALAN E. GLENN, J., delivered the opinion of the court, in which JOSEPH M. TIPTON, P.J., and D. KELLY THOMAS, JR., J., joined.

Paul E. Meyers, Assistant Public Defender, for the appellant, Luis Angel Cruz.

Robert E. Cooper, Jr., Attorney General and Reporter; Mary E. François, Assistant Attorney General; James G. Woodall, District Attorney General; and James W. Thompson, Assistant District Attorney General, for the appellee, State of Tennessee.

## OPINION

### FACTS

While home caring for his two youngest children on the morning of April 27, 2007, the defendant telephoned 911 to report that the victim, five-month-old Naudia, was shaking and unresponsive. The victim was first transported by ambulance to Jackson-Madison County General Hospital and then airlifted to Le Bonheur Children's Hospital in Memphis, where a pediatrician concluded that her injuries, which included a subdural hematoma and retinal hemorrhaging, were consistent with shaken baby syndrome. The defendant was subsequently indicted on one count of

aggravated child abuse, a Class B felony, and tried before a Madison County Circuit Court jury on January 28, 2008.

Summer Cruz, the victim's mother and the defendant's wife, testified that she went to work on the morning of April 27, 2007, leaving the five-month-old victim, Naudia, and her four-year-old sister, Mya, in the care of the defendant. While at work, she received a telephone call from her mother, who informed her that the baby was having seizures and that she needed to get to the hospital. Cruz testified that the victim was airlifted that same day from Jackson-Madison County General Hospital to Le Bonheur Children's Hospital in Memphis, where she was diagnosed with shaken baby syndrome. She said that the victim remained hospitalized for two weeks before being discharged and was still under the care of a neurologist in Memphis and a physician in Jackson.

On cross-examination, Cruz testified that she later learned that the defendant had telephoned her at the deli where she worked but had not been allowed to speak to her because it was during the lunch rush. She acknowledged that it was the defendant who had called 911 and said she assumed it was he who had notified her mother about the victim's condition.

Investigator Danielle Jones of the Jackson Police Department testified that she interviewed the defendant on April 30, 2007. At the request of the State, she read aloud the defendant's statement, which was subsequently admitted into evidence:

> On the 27th, Friday, I was watching the kids while my wife, Summer, was at work. The baby Naudia was on the floor watching TV and I dozed off for about 20 minutes. Naudia started crying and I checked her and she was soiled. I cleaned Naudia and she kept crying. I have a door alarm on the front and back door and one of them went off. I was going back and forth with Naudia cleaning her. I had her in the crib and went to the bathroom to get a towel. When I came back Naudia was shaking and wasn't crying. I started trying to wake up Naudia by putting cold water on her face and hitting her face trying to wake her. I called 911 and put my finger in her mouth thinking she swallowed her tongue until the guy on 911 said don't do that. I don't remember anything happening but just hearing the noise. I did not drop Naudia or shake or hit her. I don't know what caused her seizures or injury!

Dr. Karen Lakin, a pediatrician and the medical director for the Le Bonheur Child Assessment Program, testified that she became involved in the victim's case on May 2, 2007, due to concerns that the victim's injuries, a subdural hematoma, bilateral retinal hemorrhages, and bruising to the head, were the result of non-accidental trauma. She said the victim's medical history indicated the victim's father reported that he might have bumped the victim's head on the changing table, which could account for the external bruise, but there was nothing in the victim's medical history, such as a high speed car accident, which would account for the subdural hematoma and retinal hemorrhages. She, therefore, concluded that the victim's injuries were consistent with shaken baby syndrome, testifying that the case was "a very classic presentation that we see in children that have been violently shaken." She said that the injuries the victim sustained were life-threatening and caused her to suffer brain damage. According to Dr. Lakin, the victim's seizures were indicative of the damage to the nerve cells in her brain:

Her actual presenting symptom was seizures from the other hospital. And seizures are very interesting because actually seeing the blood in the brain is not what causes the seizures.

The injury to the actual cells themselves, the nerve cells of the brain themselves, are what causes the seizures. And so that would imply that there was some type of injury at a microscopic level and not from an injury that occurred -- a trivial injury that occurred such as falling.

In her opinion, a four-year-old child would lack the strength and coordination to administer the type of shaking necessary to cause the victim's injuries.

On cross-examination, Dr. Lakin acknowledged that students of CPR classes are taught to shake an unresponsive adult. She pointed out, however, that "[i]nfant CPR is completely different from adult CPR" and that, even in adult CPR, the shaking involved "is not a violent shaking."

The thirty-one-year-old defendant testified that he stayed up until about 4:00 a.m. on Friday, April 27, 2007, trying to unpack from his family's recent move. He said he awoke again at 6:00 a.m., walked his son to school, and then returned to fix breakfast for his four-year-old daughter and his wife. After his wife left for work, he dozed off while watching television but then awoke to change and feed the victim and clean the kitchen. He later prepared the children for the walk to school to pick up his son. He testified that he had the victim in a "snuggly," or baby carrier, against his chest and was in the process of adjusting the strap when one of his door alarms went off, startling him and causing him to drop the victim from his chest to the floor.

The defendant testified that he picked up the crying victim, looked her over, rubbed her head, and placed her in the crib while he went to check the doors. When he returned, he noticed that the victim's hands were shaking and that she was no longer crying. He lifted her up from the crib, saw that her movements were unnaturally slow, panicked, and began shaking her to arouse her. Next, he ran to the kitchen and threw cold water in her face, and then placed her on the living room floor while he called 911. While on the phone with the 911 operator, he slapped the victim in the face in an attempt to rouse her until the 911 operator told him to stop.

The defendant testified that after the ambulance arrived, he telephoned his wife at work, but her co-worker would not let him speak to her. He then telephoned his wife's mother and asked her to call his wife and tell her something was wrong with the baby. He had the opportunity to finally talk to his wife when the paramedics were loading the victim into the ambulance. The defendant testified that he felt "a bit at fault" when talking to his wife, explaining that she did not like him to use the "snuggly" and had urged him to go to bed early the night before. He said he did not know at the time he shook the victim that it could be harmful to her, never intended to harm her, and was just trying to revive her.

The defendant further testified that at the time he gave the statement to police, he was exhausted from not having slept for several days and emotional at the thought of losing his wife and

children. He said he told the investigator that he had not shaken the victim because he realized it had been an irresponsible thing to do and was afraid his wife would leave him if she knew:

> I -- Like I said, I was blaming myself for those days, just blaming myself, and, um, trying, you know -- I -- I didn't want to lose my kids. And I . . . told them that I didn't sleep, I dozed off and -- and I didn't, you know -- I -- I -- It just didn't make, you know -- I just -- I don't know what to say.

> I mean, I was scared, you know, and -- and I was scared that if -- if I was to tell them the truth that I, you know -- my wife might leave, you know what I'm saying?

## ANALYSIS

### Sufficiency of the Evidence

The sole issue the defendant raises on appeal is whether the evidence was sufficient to support his conviction of the lesser-included offense of reckless aggravated assault. Specifically, he argues that the State failed to prove beyond a reasonable doubt that he was aware of, and consciously disregarded, the fact that his actions in shaking the victim risked causing her injury. The State argues that the evidence was sufficient to sustain the jury's verdict, and we agree.

In considering this issue, we apply the rule that where sufficiency of the convicting evidence is challenged, the relevant question of the reviewing court is "whether, after viewing the evidence in the light most favorable to the prosecution, *any* rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." Jackson v. Virginia, 443 U.S. 307, 319, 99 S. Ct. 2781, 2789 (1979); see also Tenn. R. App. P. 13(e) ("Findings of guilt in criminal actions whether by the trial court or jury shall be set aside if the evidence is insufficient to support the findings by the trier of fact of guilt beyond a reasonable doubt."); State v. Evans, 838 S.W.2d 185, 190-92 (Tenn. 1992); State v. Anderson, 835 S.W.2d 600, 604 (Tenn. Crim. App. 1992). All questions involving the credibility of witnesses, the weight and value to be given the evidence, and all factual issues are resolved by the trier of fact. See State v. Pappas, 754 S.W.2d 620, 623 (Tenn. Crim. App. 1987). "A guilty verdict by the jury, approved by the trial judge, accredits the testimony of the witnesses for the State and resolves all conflicts in favor of the theory of the State." State v. Grace, 493 S.W.2d 474, 476 (Tenn. 1973). Our supreme court stated the rationale for this rule:

> This well-settled rule rests on a sound foundation. The trial judge and the jury see the witnesses face to face, hear their testimony and observe their demeanor on the stand. Thus the trial judge and jury are the primary instrumentality of justice to determine the weight and credibility to be given to the testimony of witnesses. In the trial forum alone is there human atmosphere and the totality of the evidence cannot be reproduced with a written record in this Court.

Bolin v. State, 219 Tenn. 4, 11, 405 S.W.2d 768, 771 (1966) (citing Carroll v. State, 212 Tenn. 464, 370 S.W.2d 523 (1963)). A jury conviction removes the presumption of innocence with which a

defendant is initially cloaked and replaces it with one of guilt, so that on appeal, a convicted defendant has the burden of demonstrating that the evidence is insufficient. See State v. Tuggle, 639 S.W.2d 913, 914 (Tenn. 1982).

The defendant was convicted of the lesser-included offense of reckless aggravated assault. A person commits reckless aggravated assault who recklessly commits an assault and causes serious bodily injury to another. See Tenn. Code Ann. § 39-13-102(a)(2)(A) (2006).

> "Reckless" means that a person acts recklessly with respect to circumstances surrounding the conduct or the result of the conduct when the person is aware of, but consciously disregards a substantial and unjustifiable risk that the circumstances exist or the result will occur. The risk must be of such a nature and degree that its disregard constitutes a gross deviation from the standard of care that an ordinary person would exercise under all the circumstances as viewed from the accused person's standpoint[.]

Id. § 39-11-106(a)(31).

The evidence presented at trial showed that the victim's injuries occurred while she and her four-year-old sister were under the sole care of the defendant at home. The defendant, who initially denied that he had shaken the victim, admitted at trial that he had done so but claimed that his actions were merely an attempt to revive her when she began having seizures following her fall to the floor. The State's expert witness, however, opined that the victim's injuries were consistent with shaken baby syndrome. She further testified that the injuries were not the result of a simple fall but instead required a violent shaking that could not have been performed by a four-year-old child. Based upon the violent, physical acts the evidence showed would be required to cause the victim's significant injuries, a rational juror could find beyond a reasonable doubt that the defendant was aware of and disregarded the risk that his actions would injure the victim.

## CONCLUSION

Based on our review, we conclude that the evidence was sufficient to sustain the defendant's conviction. Accordingly, we affirm the judgment of the trial court.

_____
ALAN E. GLENN, JUDGE